**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Roger E. HADDAD, Defendant–Appellant.**

**No. 92–2041.**

United States Court of Appeals,
Seventh Circuit.

Argued April 28, 1993.

Decided Nov. 16, 1993.

Barry R. Elden, Asst. U.S. Atty., Ronald D. May, and Gregory T. Mitchell (argued), Office of the U.S. Atty., Cr. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Ronald J. Clark (argued), Chicago, IL, for defendant-appellant.

Before BAUER and COFFEY, Circuit Judges, and EISELE, Senior District Judge.*

* Hon. G. Thomas Eisele of the Eastern District of Arkansas, sitting by designation.

**1254**

EISELE, Senior District Judge.

The defendant, Roger E. Haddad, was charged with knowingly possessing one Intratec TEC–9, 9 millimeter, semi-automatic pistol, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year. The gun had been found on March 14, 1991, in the defendant's apartment during the execution of a search warrant. The defendant entered a not guilty plea to the charge.

Mr. Haddad filed a Motion *In Limine* to prevent the Government from introducing at trial his April 1, 1992, guilty plea to a state misdemeanor charge of illegal possession of the same weapon that was charged in the federal indictment. The district judge overruled this motion.

During the trial the Court allowed into evidence the part of a statement that defendant made to a local police officer that admitted that the marijuana found near the TEC–9 gun was his, while excluding the rest of defendant's statement in which the defendant denied any knowledge of the gun.

Following a jury trial the defendant was convicted. On April 23, 1992, the District Court sentenced the defendant to imprisonment for 25 months to be followed by five years of supervised release. In arriving at the offense level under the Sentencing Guidelines law the district judge imposed a two level increase for an attempt to obstruct justice predicated on two incidents occurring during the trial, one out of the courtroom, and one in the courtroom in the judge's presence. It is necessary to describe those incidents.

After a recess in the trial on February 11, 1992, ATF Agent Traver testified that during the break, he overheard defendant, who was free on bond, say "I'm going to fucking kill somebody," and "Bad guy, bad guy," while looking in the direction of the prosecutor and then, with a sweeping gesture, "To hell with all agents, lawyers." (Tr. 115–116). Agent Traver stated that the remarks were not directed at him and that Haddad was speaking in the general direction of his girl friend, Ms. Deb McMullin. (Tr. 116). There was no request to revoke defendant's bond and the trial resumed without delay.

During the direct examination of Ms. McMullin by defendant's attorney the following occurred:

Q: And where did the agents have their guns?

A: Drawn and one to his head.

Q: Now, did they—you said—

DEFENDANT: That's what the—

THE COURT: Mr. Haddad—

By Mr. Clark

Q: You said that—

THE COURT: Excuse me for one moment. (Discussion had off the record.)

THE COURT: Proceed.

By Mr. Clark

Q: While the agents were there you had occasion to go into the bathroom, did you not?

These episodes and the Court's response to them later became the basis for an "obstruction" enhancement pursuant to Section 3C1.1 of the Sentencing Guidelines.

The defendant raises three issues in this appeal:

1. Whether the District Court erred in allowing the introduction into evidence of a guilty plea in a State Court Criminal case as an admission of the defendant of his guilt in this case.

2. Whether the Court erred in not allowing a portion of an oral statement into evidence in which the defendant denied guilt of the crime charged here when the court allowed into evidence another part of the same statement as an admission.

3. Whether the District Court erred in imposing a two-point enhancement for obstruction under the Sentencing Guidelines.

Because harmless error is urged in connection with certain of the defendant's contentions, it will be helpful to summarize the evidence.

**The Government's Case**

To establish its case the Government introduced a stipulation that the weapon at issue had traveled in interstate commerce prior to March 14, 1991. It also introduced a stipula-

tion that the defendant has been convicted of a felony before March 14, 1991. And it was a further stipulation that the defendant leased the apartment in which the gun was found on March 14, 1991.

ATF Agent David Balkema testified that he and several other ATF agents, together with four local police officers went to the defendant's apartment to execute a search warrant on March 14, 1991. After twice knocking and announcing their official status, they used a police ram to break down the door. The defendant was sitting on a couch in the living room next to his girl friend, Ms. Deborah McMullin, who shared the apartment with the defendant. In support of the government's theory of constructive possession, ATF Agent David Balkema testified that the Intratec TEC–9 pistol was found under the defendant's water bed, approximately two feet from the side edge thereof and within arms' reach of anyone lying on the bed. The box containing the pistol was located six inches directly behind some marijuana which was also found under the bed. Next to the pistol inside the box was a magazine with ammunition in it.

Detective William Linder testified that immediately after these items were found, Mr. Haddad stated that he had purchased the marijuana. Detective Linder also testified that he filed a state criminal complaint alleging that the defendant possessed this same pistol without a valid Illinois Firearm Owners Identification Document. (FOID card.)

Assistant state's attorney Alice Tracy testified that she, the defendant, and the defendant's attorney, Mr. Donald Weaver, appeared in the Circuit Court of Kane County on April 1, 1991, and negotiated guilty pleas to the charges filed by Detective Linder. Pursuant to the plea agreement, the defendant pled guilty to possessing a pistol without having an Illinois Firearm Owners Identification document. Ms. Tracy could not remember the specifics of defendant's state court case but she did explain the state judge's customary procedures in handling such pleas. She stated that the judge would advise defendants of their right to plead not guilty; their right to have a trial; and the right to confront and cross-examine witness-

es. She testified that the judge customarily called upon the Assistant State's Attorney to explain the factual basis of the charge and to set out the facts contained in the police report. Ms. Tracy testified that the judge had indicated his acceptance of Mr. Haddad's guilty pleas by placing his markings in the file adjacent to the charges. In the defendant's federal trial, he did not object to the admission of the guilty plea or to the admission of a copy of the state complaint.

The last witness for the government, Mr. Douglas Howard, Manager of the Illinois State Police Firearms Owner Identification Program, explained that program and the requirement that owners of firearms have a FOID card. A convicted felon may not own a firearm and is not eligible for a FOID card.

In 1978 the defendant applied for and received a valid FOID card but it was revoked in 1979. Mr. Howard then identified various applications and reapplications submitted by the defendant from 1984 to 1991. All were denied because the defendant was a convicted felon. On all of the applications, save one, the defendant denied having been a convicted felon. Mr. Howard further testified that the defendant, Mr. Haddad, was notified in writing each time that one of his applications had been denied and that he was informed that the reason for the rejections was that he had been convicted of a felony.

### The Defense's Case

Ms. Debbie McMullin, the defendant's girlfriend testified that she was living with the defendant at 1347 Todd Farm Drive in Elgin at the time of the trial and was living with him prior to and, at the time of, the search that turned up the gun. She testified that she purchased the nine millimeter TEC–9 pistol in January of 1991 from JBL Enterprises. She dealt with a Mr. John Lambie, who stated that the gun was a collector's item from Desert Storm. She bought it as a surprise gift for the defendant who she thought would soon get back his Illinois FOID card, which, in turn, would permit him to be a legal gun owner. Ms. McMullin testified that she herself had a FOID card. This card was introduced into evidence along with the receipt from JBL made out to her.

She also testified that she filled out the Firearm Regulation form.

Ms. McMullin testified that the defendant drove her to JBL Enterprises when she initially went there to see about the gun, but that the defendant stayed outside while she went in and ordered the gun. She further testified that when she later went back to get the gun, which was intended to be a surprise to the defendant, she went by herself.

Ms. McMullin testified that she had never told the defendant that she had a gun and "had never shown it to him." She stated that she put it in a box and hid it behind the bed because it was going to be a surprise. So far as she knew the defendant had never had the gun in his possession. Ms. McMullin further testified that when the police entered the apartment and searched it she lied by stating that she knew nothing about the gun.

Mr. John Lambie testified that he was a licensed gun dealer doing business as JBL Enterprises and that Debbie McMullin had purchased the gun from him. He stated that on the first visit she picked out the gun and gave him the money for it. After the three day waiting period she returned and picked it up. Mr. Lambie further testified that Ms. McMullin had a FOID card and that she personally purchased the gun.

Mr. Donald J. Weaver, the attorney for Mr. Haddad in the state court proceedings, testified that there had actually been no hearing in state court. He stated that in Kane County it is the state's attorney who actually makes the notation on the files as to dispositions, not the judges. He recalled that he had negotiated a disposition of the gun and the marijuana counts with the state's attorney which called for "supervision". He testified that this disposition really amounts to a lengthy continuance which, after the passage of time, results in a dismissal of the charges. He further testified that he told the defendant that if the case were disposed of in this manner, and if the defendant stayed out of trouble, the charges would be dismissed. Mr. Weaver testified that the judge never determined from the defendant whether the defendant understood a plea of guilty or what it meant, but he did acknowledge that the defendant checked a box which said "guilty" and another which said "waive jury trial."

Mr. Weaver concluded that he told Mr. Haddad that they could dispose of the case by "supervision" and that Mr. Haddad would be discharged at the end of the year. In this way he would not have to pay a lawyer's fee to go to trial and the charge "just blows away."

By way of rebuttal the government called ATF Agent Cynthia Beebe and recalled Mr. John Lambie. Ms. Beebe testified that she interviewed Ms. McMullin after the search on March 14, 1991, at which time Ms. McMullin stated that the gun was not hers and that she had not seen it before. She also stated that she did not have a FOID card. Mr. Lambie acknowledged that he possibly did tell Ms. McMullin that the TEC–9 was a Desert Storm weapon.

### Admission Into Evidence of Defendant's State Court Guilty Plea

It will be recalled that, prior to the trial, the defendant filed a motion *In Limine* to preclude the use of defendant's state court plea as an admission in this case. The District Judge denied this motion in a Memorandum Opinion and Order dated February 10, 1992.

The defendant's, state court charges were: (1) possession of a firearm without having an Illinois Firearm Owner's Identification Document (a FOID card); (2) unlawful possession of a hypodermic syringe; and (3) unlawful possession of marijuana. The firearm involved in the FOID count was the same firearm as that forming the basis of the federal charge here. On April 1, 1991, the defendant pled guilty to each of the three state court charges. These pleas were reflected in a certified document from the circuit court of Kane County, which document was made available to the District Judge below in connection with the disposition of the Motion *In Limine*. The District Judge also had before him the affidavit of Ms. Alice Tracy, the Assistant State's Attorney, which stated that it was the customary practice of the state court judge who handled defendant's state case "to ask for a factual basis before accepting a [guilty] plea." The defen-

dant submitted no evidence in support of his motion.

On appeal the defendant challenges Judge Aspen's decision arguing that the use of a prior State Court plea where the defendant did not have a "full and fair opportunity" to litigate any factual issues in dispute is proscribed by *Rodriguez v. Schweiger*, 796 F.2d 930, 933–934 (7th Cir.1986), *cert. denied*, 481 U.S. 1018, 107 S.Ct. 1899, 95 L.Ed.2d 506 (1987). He relies heavily on the testimony of Mr. Weaver (defendant's State Court attorney) at the trial below. But even accepting the defendant's theory concerning the admissibility into evidence of the state court plea, he has a problem: the defendant did not present the testimony of Mr. Weaver (or anyone else) or any affidavits in support of his Motion *In Limine*. The pertinent portion of Judge Aspen's opinion makes this clear:

> Haddad claims that the circumstances surrounding his plea render it invalid. Specifically, Haddad argues that the court did not elicit a waiver of constitutional rights nor make any inquiry into whether the defendant had any understanding of the charges, of the plea or the consequences. While these assertions might ordinarily raise some questions concerning the proceedings in Kane County, they are completely unsubstantiated. It is well settled that Haddad, as the movant, possesses the burden of establishing the alleged defects in the state proceedings ... In order to meet this burden, Haddad might have presented a copy of the transcript of the guilty plea. To the extent that such a transcript does not exist, Haddad could have submitted an affidavit from either the state court judge or clerk. At a bare minimum, Haddad should have included a supporting affidavit from the lawyer representing him during the state proceedings. Having failed to submit any such materials, Haddad has not met his initial burden of production. Consequently, we cannot conclude that Haddad did not have a full and fair opportunity to present a defense to counter any disputed facts regarding the state charge in question.[1]

[1] Given Haddad's failure to meet his initial burden of production, there is no need for this court to issue a conclusive finding as to whether the state court proceedings were in fact defective. We note, however, that the government has submitted an affidavit indicating that the state court judge did advise Haddad of his rights and the possible consequences flowing from a plea of guilty. Affidavit of Alice Tracy, Assistant State's Attorney, at 2, ¶ 8. After receiving such advice, Haddad entered a plea of guilty and waived his constitutional rights, as acknowledged by his signature under the box marked "I Hereby Plead Guilty and Waive Jury Trial" on the certified state document. *Id.* at ¶ 9.

Considering what was before Judge Aspen, it is clear that his decision to overrule the Motion *In Limine* was correct. And, equally obvious, he left the issue open for reconsideration. But at the trial the defendant did not object to the admission of the guilty plea or to the admission of a copy of the state complaint. Rather he accepted the invitation contained in the last paragraph of Judge Aspen's opinion of February 10, 1992, to-wit:

> In sum, as the Illinois courts would treat Haddad's guilty plea as an admission in a subsequent proceeding against him, and in the absence of an indication that Haddad was not afforded a full and fair opportunity to litigate the factual issues in dispute, we too will admit evidence of the plea as an admission. However, as with all evidence, the jury will have the opportunity to determine its weight. Thus, the admission is not conclusive evidence, and Haddad will be allowed to present testimony in order to rebut the factual basis of the guilty plea. It is so ordered.

■ A conditional ruling by the district court is not preserved on appeal if the objecting party does not renew his or her objection at trial or seek reconsideration of that ruling. See *United States v. Dougherty*, 895 F.2d 399, 403 (7th Cir.) It is clear from Judge Aspen's opinion, as quoted above, that he had not closed the door on this issue.

■ At the trial the defendant put on the testimony of Mr. Weaver, the defendant's state court attorney, to rebut the factual basis of his guilty plea and to diminish the weight to be given to his plea. See the summary of Mr. Weaver's testimony, *supra.* The defendant did not ask Judge Aspen to reconsider his decision either before or after

the testimony of Ms. Tracy and Mr. Weaver was received in evidence. Nor did he at any time ask the trial court to strike the evidence previously admitted of the defendant's state court guilty plea. He has therefore affirmatively waived the issue.

■ Even had defendant not waived the issue, he cannot prevail. Guilty pleas are clearly admissible under the Federal Rules of Evidence 801(d)(2) as relevant statements of the defendant *United States v. Howze*, 668 F.2d 322, 324, n. 3 (7th Cir.1982). The burden is on the defendant to show that there is some defect that renders inadmissible such otherwise admissible evidence. *United States v. Ferguson*, 935 F.2d 862, 867 (7th Cir.1991). To prevail in such an attack the defendant must overcome the strong presumption of regularity which is attributable to state court proceedings. *United States v. Polk*, 908 F.2d 212, 215 (7th Cir.1990).

Although the United States Supreme Court set forth the standard by which to measure the constitutionality of a guilty plea in *Boykin v. United States*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), that standard is not applicable here.

■ The parties have structured their arguments on this issue on the theory that the test for the admissibility in a federal criminal trial of a guilty plea entered in another court (here the State Court) would be the same as the test applied to determine if a defendant should be permitted to withdraw or set aside his guilty plea in the same court and same proceeding in which it was entered. The government in a footnote in its brief suggests that in the former case the guilty plea should be treated as any other admission or confession made by the defendant, i.e. that we need not apply the *Boykin* standard. See footnote 12, page 27, Brief of the United States. We agree. If the defendant stated to a person on the street that he was in fact guilty of possessing this gun, his statement would be admissible against him in his federal criminal trial. The fact that he made the admission in a separate state court criminal procedure does not change the evidentiary test. So Judge Aspen was in any event clearly correct in admitting at trial the evidence of defendant's guilty plea in State Court.

## The Exclusion of Exculpatory Portion of One of Defendant's Statements.

■ At the trial Elgin Police Officer Linder testified that the defendant, after his arrest, admitted knowing that the marijuana was under his bed. However, when defendant's counsel attempted to elicit from Linder that Mr. Haddad had, at the same time, denied knowledge of the gun, the Court sustained an objection to that exculpatory portion of defendant's statement. The defendant claims this was error since the exculpatory remarks were part and parcel of the one statement which also included the inculpatory reference to defendant's knowledge of the marijuana. We agree.

The defendant further contends that this evidentiary ruling prejudiced his right to a fair trial by creating a false inference in the minds of the jurors. We disagree. Clearly the error was harmless.

■ Ordinarily a defendant's self-serving, exculpatory, out of court statements would not be admissible. But here the exculpatory remarks were part and parcel of the very statement a portion of which the Government was properly bringing before the jury, i.e. the defendant's admission about the marijuana.

Rule 106 of the Federal Rules of Evidence states:

> When a writing of recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

As we see, by its terms the rule refers to written or recorded statements. However Rule 611(a) gives the district courts the same authority with respect to oral statements and testimonial proof. See *Weinsteins Evidence* Vol. 1, 106–4 (1992 Ed.) And the Seventh Circuit has applied a Rule 106 analysis with respect to oral statements and testimonial proof. See *United States v. Lewis*, 954 F.2d 1386, 1392 (7th Cir.1992). Under this Court's decisions the portions of the state-

ment that the proponent seeks to admit must, of course, be relevant to an issue in the case. Even then, the trial judge need only admit the remaining portions of the statement which are needed to clarify or explain the portion already received. See *United States v. Velasco*, 953 F.2d 1467, 1475 (7th Cir.1992) and *United States v. Sweiss*, 814 F.2d 1208, 1211 (7th Cir.1987).

█ Under the test set forth in *Velasco* the Court is to apply a four-part test in order to determine whether the offered portions of the statement is necessary to: 1) Explain the admitted evidence, 2) Place the admitted portions in context, 3) Avoid misleading the trial of fact, and 4) Insure fair and impartial understanding of the evidence. *Velasco* at 1475. This Court will not disturb a district court's decision regarding a rule of completeness issue absent an abuse of discretion. *Velasco* at 1475. Still we conclude that the proffered exculpatory portions of Mr. Haddad's statement to Officer Linder meets each part of this test.

The marijuana that Mr. Haddad admitted placing under the bed was only some six inches from the implicated gun. The defendant in effect said "Yes, I knew of the marijuana but I had no knowledge of the gun." The admission of the inculpatory portion only (i.e. that he knew of the location of the marijuana) might suggest, absent more, that the defendant also knew of the gun. The whole statement should be admitted in the interest of completeness and context, to avoid misleading inferences, and to help insure a fair and impartial understanding of the evidence. The error in the evidentiary ruling was, nevertheless, harmless.

Even though Mr. Haddad did not testify, he called his girlfriend, Ms. McMullin, to the witness stand. She testified that it was she who purchased the gun and that she hid it from the defendant and that the defendant had no knowledge of the weapon. So the defendant got before the jury the same message that is contained in the exculpatory portions of his statement to Officer Linder, to-wit: that he had no knowledge of the gun.

## The Two–Point Enhancement for Obstruction under Sentencing Guidelines

The two incidents that formed the basis for the trial court's imposition of a two-point enhancement for obstruction of justice are described in the probation officer's Presentence Report as follows: (1) "... it has been reported that the defendant attempted to threaten the prosecutor during the course of the trial," and (2) "... it has also been reported that the defendant made gestures towards and perhaps even coached his girlfriend, Debbie McMullin, during her testimony at the trial, in an effort to suborn perjury." After reporting these incidents the probation officer states, "It appears that the defendant has obstructed justice within the meaning of the Guidelines and, therefore, two points are added to the base offense level."

With respect to the first incident the defendant argues:

As reported, the incident involved nothing more than angry remarks made by the defendant to his girlfriend outside the courtroom but overheard by others. The proceedings were in no way delayed or obstructed and there is nothing to indicate any attempt to intimidate. Indeed, when asked by the Judge if the government sought any action by the Court, Assistant United States Attorney May stated he did not.

Defendant–Appellant's Brief, p. 20.

With respect to the second incident, defendant argues:

There is no evidence that Debbie McMullin lied and absolutely no evidence that the defendant coached her. There is further no evidence in the record that any witness was "coached" during testimony.

During Ms. McMullin's testimony the defendant did utter some words, "That's what the—," before he was cut off. He did this during a question by his counsel. (Tr. 120) This caused no delay in the proceedings and cannot fairly be construed as an attempt to coach a witness or obstruct or impede the proceedings. Certainly, no obstruction or impediment occurred.

Nothing in this record would support a finding of obstruction under § 29 3(C)(1) of the Federal Sentencing Guidelines.

Defendant–Appellant's Brief p. 20–21.

On April 28, 1992, the trial judge entered an "Addendum To Presentence Report" pursuant to *United States v. Rodriguez–Luna*, 937 F.2d 1208 (7th Cir.1991) and Federal Rules of Criminal Procedure 32(c)(3)(D), a portion of which reads as follows:

We overruled Mr. Haddad's objections to a 2 point increase under § 3C1.1, finding that he had indeed obstructed or impeded the administration of justice during his trial.

Section 3C1.1 of the Sentencing Guidelines reads:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The Government also cites the following "Application Notes":

3. The following is a non-exhaustive list of examples of the types of conduct to which this enhancement applies:

(a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

(b) committing, suborning, or attempting to suborn perjury;

§ 3C1.1 Commentary, 3.(a)(b).

It is important to keep in mind that the "obstruction" Guideline, § 3C1.1, as well as all other "adjustments" under chapter III of the Guidelines, must be interpreted and determined on the basis of the language in Guidelines § 1B1.3(a)(1) which states:

§ 1B1.3. *Relevant Conduct (Factors that Determine the Guideline Range)*

(a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i) the base offense level where the guidelines specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following.

(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;

Now we know that, here, the threatening of an Assistant U.S. Attorney and the attempt to influence the witness, Debbie McMullin, assuming such acts were committed, did not occur "during the commission of the offense of conviction" or "in preparation for that offense" or "in the course of attempting to avoid detection." Did these acts occur "in the course of attempting to avoid ... responsibility for" the offense of conviction? Attempting to suborn a witness, if it occurred, would appear to meet this Guideline language, but it is difficult to see how the defendant's actions in the hallway in relation to the Assistant U.S. Attorney could be considered an "attempt to avoid responsibility" for the offense of conviction.

■ The language of the obstruction guideline, § 3C1.1, is both narrower and broader than § 1B1.3. Under § 3C1.1 if the defendant "willfully obstructed or impeded the administration of justice" or attempted to do so, a 2 level increase is required. In § 3C1.1 there is no explicit requirement that the acts or omissions of the defendant be committed "in the course of attempting to avoid responsibility for the offense of conviction" as is required in § 1B1.3. § 3C1.1 only requires that the defendant's acts or omissions "obstruct or impede the administration of justice." But § 3C1.1 does add the "willfully" requirement. Since the adjustment in Chapter 3 (here, § 3C1.1) are to be determined on the basis of the quoted language in § 1B1.3(a)(1), we conclude that in order to impose a two level increase in the case for "obstruction" under the Guidelines the Court would have to find that the acts of the defendant alleged to obstruct or impede justice were done "willfully" and with the specific

intent "to avoid responsibility" for the offense for which he was being tried.

The Court below found that the defendant "had indeed obstructed or impeded the administration of justice during his trial." The trial judge made a similar statement at the conclusion of the colloquy on this issue:

> The Court: Although I think it's clear that Mr. Haddad was upset and that he was out of control and that he wouldn't have done the acts that he did had he been under control and had he not been upset, it's also clear that the acts that are referred to in the presentence report in calculating the obstruction of justice two level increase did, in fact, amount to an attempt to obstruct justice, and for that reason I will uphold the calculation of the Probation Department and overrule the objections of the defendant.

Tr. 4–7.

So there are two questions: 1) did the trial court make adequate factual findings to impose the two point adjustment, and 2), if so, does the record disclose an adequate evidentiary basis for such findings?

The probation report is in the record. It reflects how the probation officer calculated the sentencing range. The base offense level under Guideline 2K2.1(a)(7) was 12. For the reasons stated above the defendant received a 2 level increase for obstruction under Guideline 3C1.1. The defendant was also denied a credit for acceptance of responsibility which is explained in the pre-sentence report as follows:

> Acceptance of Responsibility: The defendant denies having knowledge that the firearm existed. Therefore it is this writer's opinion that he has not accepted responsibility for the instant offense.

The defendant's criminal history was fixed at category III on the basis of 5 criminal history points, at least one of which was predicated upon his state court guilty plea to the possession of the same gun involved in this case. With an offense level of 14 and a criminal history category of III the sentenc-

ing range was fixed at 21 to 27 months. The Court imposed a sentence of 25 months.

If the 2 point increase for obstruction had not been given the offense level would have been 12, the criminal history category III, and the resulting sentencing range 15 to 21 months. On average, then, the defendant was facing an increase in sentence of 6 months by virtue of the obstruction finding. The difference between the maximum possible sentence under offense level 12, which is 21 months, and the sentence actually given under level 14, which is 25 months, is 4 months. That constitutes the minimum additional penalty occasioned by the two point increase. The maximum decrease possible if level 12 had been used would be 10 months. That is the difference between the minimum possible sentence, 15 months, and the sentence actually imposed, 25 months. So the finding of obstruction has a significant impact upon the defendant's sentence particularly under the guideline regime pursuant to which the sentence imposed is the sentence served less only a small credit for "good time." Put otherwise, if a person is charged with a *crime* which, upon conviction, would expose him or her to a *possible sentence* of 10 months then that person would be entitled to a jury trial and all of the other procedural and constitutional protections incident to regular criminal trials including the right to confront and cross-examine the witnesses against him. See *Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970), holding that the defendant was entitled to a jury trial for an alleged violation of the city's "jostling" ordinance because, under that ordinance, there was the *possibility* that the sentence could exceed six months. But under the guideline regime no indictment or jury trial or criminal quality due process is required to imprison the defendant not only for months but even for years.[1]

 Is threatening an Assistant U.S. Attorney or attempting to influence a witness "related conduct," that is, related to the crime of conviction, here the possession of a weapon by a felon? Guideline Section 1B1.3,

---

1. For instance, if the crime of conviction here carried an offense level of 36, the sentencing range for a 2 point enhancement would go from 235–293 up to 292–365 (assuming a criminal history of III) or a mid point increase of over 5 years.

quoted above, gives an expansive interpretation of "Relevant Conduct." Under it, ordinary *crimes* such as perjury, subornation of perjury, escape, and obstruction of justice arguably become "relevant conduct" or "sentencing factors." According to Guidelines theorists, these semantics are enough to exempt such criminal conduct from the provisions of the 5th and 6th Amendments to the U.S. Constitution even though persons can be sent to prison for months and even years by proving with "reliable information" (not trial quality evidence) to a judge (not a jury) that it is more probably true than not true (not "beyond a reasonable doubt") that the defendant committed such "relevant conduct" (not crime).[2]

2. There are judges, and this judge is one of them, that believe that most of the "related conduct" enhancements are unconstitutional. See *United States v. Galloway*, 943 F.2d 897 (8th Cir.1991), rehearing en banc, 976 F.2d 414 (8th Cir.1992) *cert. denied*, —— U.S. ——, 113 S.Ct. 1420, 122 L.Ed.2d 790 and *United States v. Clark*, 792 F.Supp. 637 (E.D.Ark.1992) Why? Because these enhancements are nothing more or less than *crimes* and, as such, trigger the requirements of the 5th and 6th Amendments to the constitution requiring separate indictment by a grand jury, criminal trial quality due process, the right of confrontation, trial by jury and proof beyond a reasonable doubt. Why must they be understood to be "crimes" and involve "criminal prosecutions" within the letter and spirit of those constitutional provisions? The answer is obvious if one agrees that a "crime" is any act or conduct, the proof of which will subject a person to lawful imprisonment and to a deprivation of his or her liberty for a period of months or years *and, without the proof of which, that person may not be so imprisoned.*

Under the old discretionary sentencing regime these constitutional problems simply did not arise. Congress vested in Article III judges the authority to impose sentences within statutory limits and did not limit the manner of the exercise of that discretion. Proof of the crime charged released this broad sentencing discretion. *No proof of additional facts or conduct (that is, beyond the proof of the elements of the crime charged) was required* to permit any sentence within the *statutory* limits.

Under the new (post-November 1987) sentencing regime, the judge may not, in the exercise of discretion, impose a sentence greater than the top of the range permitted by the "Guidelines" for the offense of conviction unless. *additional facts or conduct are proved.* So it is not now proper to state that these additional facts are just "sentencing factors" relating to the conviction of the crime charged in the indictment. Why? Because the maximum sentence for the crime charged is now precisely set by the Guidelines. Therefore any sentence *in addition thereto* cannot possibly be for *that crime.* No, *the additional sentence is based on proof of additional facts and conduct.* And the sentence imposed may not exceed the maximum sentence permitted under the guidelines for the offense of conviction, *absent* the proof of these additional facts, conduct or circumstances. Put another way, these additional facts, conduct or circumstances have nothing to do with the establishment of the maximum penalty for the crime actually charged.

For instance, the maximum sentence here without the "enhancement" for obstruction would be 21 months. Remember, the offense level would then be 12 and the criminal history category III yielding a range of 15 to 21 months. The sentence actually imposed was 25 months. But everyone acknowledges that the Court would not be able to impose a sentence above 21 months without establishing the "adjustment" of obstruction. So the extra four months sentence that the court imposed was not imposed for the crime of conviction (for which the maximum sentence was 21 months). It could only be imposed upon a finding of *obstruction*. Again, the 4 months' sentence is for "obstruction", and not for the crime charged (possessing the Intratec TEC–9, 9 millimeter, semiautomatic pistol having previously been convicted of a crime punishable by imprisonment for a term exceeding one year). So if the Court is sending Mr. Haddad to prison for 4 months for obstruction, and if the Court could *not* have sent him to prison for that 4 month period *without proof of that obstruction of justice*, how can it be argued that such obstruction is not a *crime?* And if it is a "crime," and if it is involved in a "criminal prosecution," why then do the 5th and 6th Amendments not apply? It is suggested that they do apply and that the U.S. Supreme Court will so hold if it ever accepts such a case. But the constitutional issue need not be reached here because the trial court did not meet the requirements of the current sentencing regime.

It is also interesting to consider to which protections the defendant would have been entitled if either of the "obstruction" matters had been dealt with as a criminal contempt? Rule 42 of the Federal Rules of Criminal Procedure provides:

(a) **Summary Disposition.** A criminal contempt may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) **Disposition Upon Notice and Hearing.** A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall

The maximum sentence for the offense for which the defendant was convicted here, absent an increase for obstruction, would have been 21 months. In order to imprison him for *any* additional period of time it is necessary under the Guidelines, to prove some *additional fact or facts* (that is, in addition to the facts constituting the elements of the crime charged) which would justify such an "enhancement" under the Guidelines system. Although such procedures have been upheld under constitutional challenges, see e.g. *United States v. Galloway, supra,* footnote 3., the final words may not have been spoken. See *United States v. Clark, supra,* footnote 3., holding unconstitutional such informal procedures to establish that the defendant planned to escape after conviction but before sentencing. Of course, if the essential *guidelines requirements* for the obstruction adjustment have *not* been met, we do not reach those looming constitutional issues.

Even under the Guidelines system a factual basis must be established to support the additional sentence of imprisonment for such offenses as obstructing the administration of justice. And such offenses must be established by at least a preponderance of the evidence. It is true that criminal trial evidentiary standards need not be followed since Guideline 6A1.3 permits the Court to "consider relevant information without regard to its admissibility under the Rules of

Evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

At the sentencing hearing a judge may consider the evidence received at the trial and the information included in the pre-sentence report, if admitted, and the information developed at the sentencing hearing itself. To establish an enhancement under Guideline Section 3C1.1 it must be proved that the defendant "willfully" obstructed or impeded the administration of justice. In the context of the issues in this case it would be necessary to show that the defendant *intended to threaten the prosecutor and/or that he intended to suborn perjurious testimony* from his girl friend, Debbie McMullin, *for the purpose of avoiding responsibility for the crime for which he was being tried.* See discussion above.

The pre-sentence report contains the following information relating directly or indirectly to the willful obstruction charges:

Agent Tarver described the defendant as being "too goofy to be an informant."

Agent Traver informed this writer that the defendant had several outbursts during the trial and even said, "I want to kill somebody" as a prosecutor walked past him. Although the defendant did not resist arrest, Agent Traver described him as being "dangerous." Agent Traver does not be-

state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. The defendant is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.
Rule 42(a) deals with contempts committed in the actual presence of the Court. The attempt here to suborn perjury, if any, was in the presence of the Court. But to what cases does Rule 42(a) apply? In *Harris v. United States,* 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965) it is stated:

Rule 42(a) was reserved "for exceptional circumstances," *Brown v. United States,* 359 U.S. 41, 54, 79 S.Ct. 539, 548 [3 L.Ed.2d 609] (dissenting opinion), such as acts threatening the judge or disrupting a hearing or obstructing court proceedings. *Ibid.* We reach that conclusion in light of "the concern long demonstrated by both Congress and this Court over the possible abuse of the contempt power," *ibid.,* and in light of the wording of the Rule. Summary contempt is for "misbehavior" (*Ex parte Terry,* 128 U.S. 289, 314, 9 S.Ct. 77, 83, 32 L.Ed. 405) in the "actual presence of the Court." Then speedy punishment may be necessary in order to achieve "summary vindication of the court's dignity and authority" *Cooke v. United States,* 267 U.S. 517, 534, 45 S.Ct. 390, 394, 69 L.Ed. 767.
Perhaps what happened below was sufficient to warrant summary punishment for contempt, but we do not know because the Court did not proceed under Rule 42 and did not make the necessary findings concerning the defendant's conduct.

lieve that the defendant's girlfriend, Debbie McMullin, gave truthful testimony at the trial. He believes that Ms. McMullin is terrified of the defendant. According to Agent Traver, Ms. McMullin had stated that she bought the gun because it was used in Desert Storm. Agent Traver informed this writer that not only was the gun not used by the military, Ms. McMullin bought the gun three weeks prior to the beginning of Desert Storm. Ms. McMullin also stated that the defendant did not know about the gun, as it was a surprise for him. Agent Traver reported that the (sic) this is incorrect because the firearms dealer remembered the defendant going in with Ms. McMullin to purchase the firearm. Agent Traver does not believe that the weapons were for collection purposes.

\* \* \* \* \* \*

Regarding the trial, this writer inquired as to the defendant's demeanor in the court room. According to the defendant, at one point he told the prosecution "You're a bad man. You're lying. I am a United States Citizen, I am Lebanese and I want justice." The defendant reported that Judge Aspen warned him about this outburst. According to the defendant, when Ms. McMullin was testifying, the defendant believes she was scared and because of this she was talking softly. He said to her "talk loud." The defendant denies saying anything else and denies making any gestures towards Ms. McMullin to influence her testimony.

When this writer inquired about the defendant threatening the prosecutor, he denies having done this. According to the defendant, he was talking with Ms. McMullin and said "fuck this whole thing" as they walked by the prosecutor. According to the defendant, he made this statement because he felt that he was not receiving justice. The defendant believes that the prosecutor then told Judge Aspen that the defendant had threatened the prosecutor. The defendant related that he was nervous at the trial and had not taken his medication for two days. Therefore, he was frustrated but had no intention of threatening anyone.

\* \* \* \* \* \*

The defendant said he is sorry about what happened in the court room, and would appreciate the chance to show he is a good person.

\* \* \* \* \* \*

When this writer inquired about the defendant influencing her testimony at trial, Ms. McMullin stated, "I could not see him from where I was sitting."

Ms. McMullin is aware that the defendant is manic-depressive. She showed this writer the defendant's prescription bottle for lithium carbonate. Ms. McMullin added that when the defendant does not take his medication, he becomes irritable, but she reiterated that he is never violent towards her.

\* \* \* \* \* \*

The defendant reports that he is currently taking lithium carbonate 300 milligrams (verified), as he is manic-depressive. According to the defendant, he takes 1800 milligrams a day. During the first interview, the defendant stated, "I don't know what I will do if I don't get my medication." He informed this writer that this medication keeps him calm, "on an even level."

\* \* \* \* \* \*

*Mental and Emotional.* As mentioned above, the defendant reported that he is manic-depressant and receives lithium carbonate to control his illness. According to the defendant's attorney, Ronald Clark, the defendant was admitted to Chicago Reed for three weeks in 1978 to 1979. The defendant's wife had him committed. The defendant was transferred to Forest Hospital in Des Plaines, Illinois. He remained there for two to three weeks and was treated by Dr. Menazeze. After his release from Forest Hospital, the defendant began seeing Dr. Dresner at Old Orchard Center, from 1979 to approximately 1982 or 1983. In 1983, the defendant spent 111 days in Cook County Jail. From Cook County Jail, he was transferred to Elgin

Mental Health Center and was attended by Dr. Michael for approximately three weeks to a month. Upon his release, the defendant began seeing Dr. Cavino in the professional building in Elgin, Illinois. Dr. Cavino prescribed lithium carbonate (300 milligrams) to the defendant. The defendant ran out of money and could no longer pay Dr. Cavino, so he started seeing Dr. Shapiro. The defendant saw Dr. Shapiro twice (verified). Reportedly, the defendant had been continued on lithium by Dr. Abed at the Metropolitan Correctional Center. Verification has been requested from Old Orchard Center, Dr. Dresner, and Forest Hospital. This writer was unable to fine (sic) addresses for the remainder of the institutions. The defendant informed this writer that he went to Lebanon for approximately one year, in order to receive treatment for his mental illness. According to the defendant, he was in the hospital for two to three weeks, and returned to the United States upon his release. The defendant believes his illness to have started with his ex-wife. According to the defendant, he has never experience suicidal thoughts, but gets upset easily when he forgets to take his medication, and has a "hot temper." During the first interview with this writer, the defendant appeared to be enraged. He became loud, made quick gestures with his hands and cursed extensively. It was here that the defendant stated, "I don't know what I'll do if I don't get my medication!" The defendant apologized for this behavior at the second interview.

According to the defendant, there is no history of mental illness in his family. The defendant's girlfriend, Debbie McMullin, helps the defendant remember to take his medication.

\* \* \* \* \* \*

The defendant is currently taking lithium carbonate to control his manic-depression. The defendant has made the statement "I don't know what I'll do if I don't get my medication." This writer is inclined to concur with this self assessment and also wonders what he might do if he doesn't take his medication. He admitted to being easily upset when he does not take his medication and has admitted that he has a temper. The defendant's demeanor, along with the information stated above, leaves this writer to believe that the defendant is an extremely aggressive, dangerous and violent man, who is need of mental health treatment and supervision to ensure that he continues to take his medication.

It is this writer's opinion that the defendant has not accepted responsibility for the instant offense, as he denies having the knowledge that the firearm was in his apartment. Thus, he is not remorseful and is angry because he apparently believes he has been victimized.

Apparently in the Northern District of Illinois the probation officer obtains from the U.S. Attorney's office a document entitled "Government's Version" which is then attached to the pre-sentence report and made available to the judge. After explaining the circumstances leading up to the forced entry and search of the defendant's apartment, the statement goes on as follows:

During a break in the prosecution's case, Haddad made threatening remarks with the intention of intimidating the government's attorneys and witnesses. Specifically, Haddad told one of the government attorneys that he was a "bad man" and then immediately stated, in the presence of several witnesses, that he "was going to kill someone." He expressly indicated that he did not care about the presence of the agents or anyone else.

\* \* \* \* \* \*

Mr. Haddad also should receive a two point enhancement for obstruction under Sentencing Guideline § 3C1.1 Under § 3C1.1, a two point increase in the offense level is appropriate "if a defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, the prosecution, or sentencing of the instant offense." The application notes to this section set forth a "non-exhaustive list of examples of the types of conduct to which this enhancement applies." Mr. Haddad's obstructive conduct at the trial in this matter is reflected in the first two examples on

this list. Specifically, Mr. Haddad, as set forth above, threatened and attempted to threaten and intimidate the prosecution and its witnesses in this case. Moreover, Mr. Haddad also suborned or attempted to suborn perjury at the trial. As set forth above, the entire, incredible testimony of the defendant's girlfriend, Deborah McMullin, had the appearance of being coached and orchestrated by Mr. Haddad. In fact, Mr. Haddad's gestures during McMullin's testimony were so overt and blatant that Judge Aspen summoned additional Marshals to the courtroom.

So, at sentencing, the trial judge was made aware through the PSI and the "Government's Version" of the *opinions* of the probation officer and of the law enforcement officers handling the case but neither document, as we see, provides much *factual* information relating to either of the obstruction charges. The basis for Probation Officer Shear's recommendation for the 2 point enhancement is that "it has been reported that the defendant attempted to threaten the prosecutor during the course of his trial" and "it has also been reported that the defendant made gestures towards and perhaps even coached his girlfriend, Debbie McMullin, during his testimony at the trial." Obviously the probation officer did not attend the trial. What he reports is essentially the information he obtained from law enforcement officers and from the defendant and his girlfriend. And the Government's Version states that Mr. Haddad told one of the government attorneys that he was a "bad man" and then immediately stated . . . "that he 'was going to kill someone.'" The government concludes that the defendant "threatened or attempted to threaten the prosecution and its witnesses" and that he "suborned or attempted to suborn perjury at the trial."

The lower court, as noted above, found that "the acts that are referred to in the presentence report in calculating the obstruction of justice two level increase, did in fact amount to an attempt to obstruct justice . . ."

Again, in order to sentence the defendant to imprisonment for a term of 4 months, see analysis above, for obstruction of justice there must be specific findings and those findings must be based upon an adequate evidentiary basis.

We hold that no remand is required to dispose of the claim that Mr. Haddad obstructed justice by threatening the prosecutor in the hallway because even if there was a threat (as to which the record is unclear) it is obvious that such acts were not committed "in the course of attempting to avoid responsibility for the offense of conviction." See Guidelines § 1B1.3. Therefore no enhancement would be permitted for that conduct.

With respect to the defendant's conduct while Ms. McMullin was testifying, the Court goes back to the application note which includes in its "non-exhaustive" list of examples "unlawfully influencing . . . a witness . . . directly or indirectly, or attempting to do so" and also "suborning or attempting to suborn perjury." Neither the factual findings made nor the actual record below support an "obstruction" enhancement based upon either of these examples. We therefore hold that no such enhancement is permitted under the Guidelines.

We reverse the trial Court on the two point enhancement for obstruction and remand for resentencing on the assumption of an offense level of 12.

On all other issues we affirm.