# ILLINOIS OFFICIAL REPORTS

---

*People v. Craigen*, 2013 IL App (2d) 111300

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHAPPEL CRAIGEN, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-1300 |
| Filed | September 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder under a theory of accountability was upheld over his contentions that the evidence was insufficient to establish his guilt beyond a reasonable doubt and that the trial court abused its discretion in refusing to admit an audio recording of an interview in which he denied being at the murder scene, since the evidence that defendant knew of a common criminal design to kill a rival gang member in retaliation and that he facilitated the offense by driving the car used in the shooting would allow a rational trier of fact to find the elements of the offense beyond a reasonable doubt, and the interview that was excluded merely contradicted the later recorded interview that was admitted and did not contain anything that would have prevented the jury from being misled or that shed light on the later interview. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 08-CF-263; the Hon. Fred L. Foreman, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Thomas A. Lilien and Kerry Goettsch, both of State Appellate Defender's
Office, of Elgin, for appellant.

Michael G. Nerheim, State's Attorney, of Waukegan (Lawrence M. Bauer
and Kathryn E. Khols, both of State's Attorneys Appellate Prosecutor's
Office, of counsel), for the People.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Chappel Craigen, was convicted of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2006)) for the shooting death of Jimmie Lewis, Jr., in Waukegan, Illinois, on October 18, 2007. Defendant was sentenced to 36 years' imprisonment. On appeal, he argues that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of first-degree murder under a theory of accountability, and (2) the trial court abused its discretion in not allowing him to introduce an audio recording of his October 27, 2007, interview with police in Milwaukee, Wisconsin, during which he denied being in Waukegan on the night of the shooting. According to defendant, pursuant to Illinois Rule of Evidence 106 (eff. Jan. 1, 2011), the audio recording should have been introduced contemporaneously with the video recording of his January 16, 2008, interview with police in Clarksdale, Mississippi, during which he confessed to driving the vehicle from which Lewis was shot. For the following reasons, we affirm.

¶ 2                              BACKGROUND

¶ 3    On October 18, 2007, around 11 p.m., Lewis was fatally shot as he rode in the passenger seat of a Cadillac driven by Daniel Williams (a.k.a. Keeko). The Cadillac was traveling west on 14th Street, which forms the border between the cities of Waukegan and North Chicago, Illinois. Three bullets were recovered from Lewis's body during an autopsy. Other than the Cadillac's driver and two backseat passengers, police located no eyewitnesses. A search of the scene produced five spent shell casings. Two more bullets were recovered from the Cadillac, which had seven bullet holes on the passenger side. Ballistics evidence revealed that all five shell casings and all five bullets were fired from the same 9-millimeter weapon, which was never recovered.

¶ 4    Waukegan police obtained their first lead on October 22, 2007, when North Chicago police informed them that an individual in the North Chicago jail had information about the shooting. Waukegan police interviewed Brandon Sledge, who identified the type of gun used in the shooting, the type of car, the individuals involved, and their seating arrangement in the

car. Waukegan police arranged to have Sledge released from jail so that he could attempt to record a conversation with the alleged offenders, but the attempt was unsuccessful.

¶ 5    On October 26, 2007, Waukegan police received a phone call from a Milwaukee, Wisconsin, police detective, who informed them that two suspects in the investigation were in custody in Milwaukee on unrelated charges. Milwaukee police also had recovered a tan, four-door Saturn, which had been reported stolen in Illinois and which Waukegan police suspected had been used in the shooting. Waukegan detectives traveled to Milwaukee and interviewed defendant and Jabril Harmon. During an audio-recorded interview, defendant denied having any connection to the theft of the Saturn and denied being in Waukegan on October 18, 2007, the day of the shooting and the day the Saturn was reported stolen. Defendant refused to accompany the detectives back to Waukegan and was not arrested at that time.

¶ 6    On January 15, 2008, a Clarksdale, Mississippi, police detective contacted the Waukegan police and informed them that defendant and Donnell Green were in custody in Mississippi on unrelated charges. Waukegan police detectives Scott Thomas and Domenic Cappelluti traveled to Clarksdale to interview defendant and Green. Green was interviewed first, and approximately one hour later defendant was interviewed. During the video-recorded interview, defendant stated that he was the driver of the four-door Saturn from which the gun was fired. Green was the front seat passenger, Harmon was seated behind defendant, and Emmanuel (also known as E-Man) was seated behind Green. The group had been driving to a liquor store when they spotted a beige Cadillac being driving by a rival gang member–a "Moe," which was a member of the Black P Stone gang. Someone in the Saturn told defendant to make a U-turn, which he did. Defendant followed the Cadillac. Green pulled a gun out of a compartment of the Saturn and handed it to Harmon. As defendant drove the Saturn west on 14th Street alongside the Cadillac, Harmon fired four to eight shots into the passenger side of the Cadillac. The shots were meant for Williams, not Lewis. Defendant told the detectives that he had been a member of the Four Corner Hustlers gang since age 14 and that the motive for the shooting was an incident at an IHOP several months earlier during which he had been outnumbered by Black P Stone gang members during a fight. Defendant also told the detectives that he had obtained the Saturn in exchange for drugs. Following the shooting, the group went to Emmanuel's house, where they hid the gun. They traveled to Milwaukee the next morning and defendant subsequently fled to Mississippi.

¶ 7    On January 30, 2008, a grand jury indicted defendant and Green for first-degree murder. Prior to trial, defendant filed a motion to suppress the video of his Clarksdale, Mississippi, interview. At the hearing on the motion to suppress, Detectives Cappelluti and Thomas testified that their entire interview of defendant was captured on the video. Defendant testified that the recorded interview was staged and that, before the camera was turned on, the detectives had verbally and physically assaulted him and told him what to say during the interview. The trial court denied the motion.

¶ 8    Also prior to trial, defendant filed a motion *in limine* to admit, pursuant to Illinois Rule of Evidence 106 (eff. Jan. 1, 2011), the audio recording of his interview with police in Milwaukee. Defendant contended that the State planned to introduce the video of his Clarksdale interview and that the Milwaukee interview should be admitted

-3-

contemporaneously to put the Clarksdale interview in context. Defendant argued that the Milwaukee interview was "critical to demonstrating that his second statement was not voluntary." The trial court determined that the Milwaukee interview was self-serving hearsay and was not admissible under Illinois Rule of Evidence 106. Defendant filed a motion to reconsider, arguing that the audio recording was not hearsay, because it was being offered not for the truth of the matter asserted but, rather, "to show the effect that the audio recording had on the officers who listened to it and used it to prepare for, and ultimately interrogate, the [d]efendant." The trial court denied the motion to reconsider.

¶ 9    The following evidence was adduced at defendant's trial. Tiffany Bishop testified that on October 18, 2007, she went with three other individuals to Chicago. Williams drove the group in his Cadillac. Lewis was seated in the front passenger seat, and Bishop was seated behind him. As the group was returning to Waukegan and driving along 14th Street with loud music playing, the passenger window shattered and Lewis slumped over in his seat. Bishop did not hear any gunshots. The group drove to Vista East Medical Center, where Lewis was pronounced dead. On cross-examination, Bishop testified that she never saw who was in the other car.

¶ 10   The State called several investigating officers and detectives from the Waukegan police department, who testified to the bullets and shell casings recovered at the scene, as well as to the ballistics evidence. The State also called a Lake County deputy coroner, who testified regarding the bullets recovered from Lewis's body and the cause of death.

¶ 11   Detective Thomas testified to his interview with Sledge on October 22, 2007, as well as to Sledge's unsuccessful attempt to record a conversation with the suspects in the investigation. Detective Thomas traveled to Milwaukee on October 27, 2007, but did not interview defendant. Detectives Reed and Holman interviewed defendant in Milwaukee. Detective Thomas then discussed interviewing defendant with Detective Cappelluti in Clarksdale on January 16, 2008. The video of the Clarksdale interview was played for the jury. On cross-examination, Detective Thomas denied having any conversations with defendant before the video started, and he denied being aware of any pre-video conversations between Detective Cappelluti and defendant. Prior to the Clarksdale interview, Detective Thomas knew that defendant had been interviewed in Milwaukee, and he also knew that the audio-recorded interview pertained to the events of October 18, 2007. Detective Thomas also knew that defendant had been uncooperative during the Milwaukee interview. When defense counsel attempted to ask whether, during the Milwaukee interview, defendant had denied being in Waukegan on October 18, 2007, the State objected on the basis that the court already had ruled the audio recording inadmissible, and the court sustained the objection.

¶ 12   Charles Smith testified that, on October 18, 2007, around 10:27 p.m., he left his house in Waukegan and went outside to his car, which was the tan, four-door Saturn subsequently recovered by Milwaukee police. As he was sitting in the car, smoking a cigarette and waiting for the car to warm up, someone tapped on the window. The individual pointed a black gun at him and told him to get out of the car. Smith exited the car, and the individual got in and drove away. Smith called the police. On cross-examination, Smith denied that he traded the car for drugs.

¶ 13    During a brief recess, defense counsel again asked the court to reconsider its ruling on the audio recording of the Milwaukee interview. Defense counsel asserted that defendant was withdrawing his alibi defense, so that he could not be offering the audio recording for the truth of the matter asserted (*i.e.*, that defendant was not in Waukegan on October 18, 2007). Defense counsel further argued that the audio recording supported the defense's theory that "something happened" in Clarksdale before the video camera was turned on, because the detectives knew that defendant had been belligerent, foul-mouthed, and uncooperative during the Milwaukee interview, yet the video of the Clarksdale interview began with the officers "simply walk[ing] into" the room with defendant in a "defeated posture." Defendant contended that it was "a logical inference that these officers, knowing what they knew, might have acted differently than it appears that they did." The court again ruled that the audio recording was inadmissible self-serving hearsay.

¶ 14    The State then called Sledge, who testified that he was incarcerated in the Lawrence Correctional Facility and that he had prior convictions of armed robbery, theft, forgery, unlawful possession of a controlled substance, and unlawful use of a weapon by a felon. During October 2007, Sledge was living with Emmanuel in North Chicago. Sledge admitted that he knew defendant, Harmon, and Green, but he denied that the three men came to his house around midnight on October 18, 2007. He also denied that defendant said to him, " 'Chill, Foe, we just got at the Moes,' " or that, when asked who they "got at," defendant said " 'Keeko [(Williams)] and them.' " He further denied that defendant had asked him to hide a black 9-millimeter handgun that night. Sledge admitted that police had arranged his release from the Lake County jail on October 23, 2007, so that he could wear a wire and attempt to record a conversation with either defendant or Harmon. Sledge was then impeached with his written statement to police, dated October 23, 2007, in which he stated that defendant, Harmon, and Green came to his house, that defendant said to him, " 'Chill, Foe, we just got at the Moes,' " and that, when asked who they "got at," defendant said " 'Keeko [(Williams)] and them.' " Sledge also reported in the statement that defendant had asked him to hide a black 9-millimeter handgun. Sledge explained that the written statement was a lie, that it "just came to [his] head," and that he heard all of it "through the streets." On cross-examination, Sledge admitted that he had two cases against him dismissed after he agreed to wear the wire and that he had had disagreements with defendant in the past.

¶ 15    Before the State called its next witness, defense counsel made an offer of proof with respect to the audio recording of defendant's Milwaukee interview.

¶ 16    The State then called Detective Cesar Garcia, who testified that, on October 7, 2007, at 2:52 a.m., he responded to a report of a large fight outside the IHOP on Belvidere Road in Waukegan. When he arrived, a large group of 20 or more individuals was fighting. When he exited his car, the group scattered, except for two individuals who remained fighting. One of those individuals was Green, who was arrested. On cross-examination, Detective Garcia testified that defendant's name did not appear in the police report from the IHOP incident.

¶ 17    Due to scheduling problems, defendant then called Detective Cappelluti out of turn as a defense witness. Detective Cappelluti testified that he was one of the lead investigators into the shooting death of Lewis. He testified that, when he and Detective Thomas traveled to Clarksdale to interview defendant, he was aware that Waukegan detectives had interviewed

defendant in Milwaukee. However, the interview had pertained only to the stolen Saturn, not to the homicide. During the drive to Mississippi, Detectives Cappelluti and Thomas did not discuss the Milwaukee interview. In fact, Detective Cappelluti had not listened to the Milwaukee interview. Upon further questioning, Detective Cappelluti testified that, during the drive to Mississippi, Detective Thomas told him that defendant had not allowed detectives to bring him back to Waukegan from Milwaukee for questioning.

¶ 18 Regarding the Clarksdale interview, Detective Cappelluti initially testified that he did not have any conversations with defendant before the video camera was turned on. Upon further questioning, he clarified that there were no earlier, unrecorded interviews with defendant, but that he did say "words" to defendant and defendant said "words" to him. Detective Cappelluti then admitted to discussing the facts of the case with defendant outside of the video, but said that the discussion lasted only "seconds." Defendant also asked Detective Cappelluti for a cigarette while they were in the hallway before they entered the interview room. When asked why his police report stated that the video was set up at 6:15 p.m., Detective Cappelluti explained that he mistakenly wrote down that time because he misheard himself saying on the video that the interview began at 6:58 p.m. He was impeached with his testimony from the hearing on defendant's motion to suppress, during which the detective stated that he should have written that the video was set up at 7:15 p.m.

¶ 19 On cross-examination by the State, Detective Cappelluti testified that he did not discuss the homicide with defendant off camera. He further testified that he and Detective Thomas waited approximately one hour for defendant to be brought into the room after they finished interviewing Green. When the detectives saw that defendant was being transported down the hallway, Detective Cappelluti exited the room to use the restroom. He ran into defendant and the Clarksdale officers in the hallway, at which time defendant asked him for a cigarette. Defendant also told him that "he knew what this was all about and he was going to cooperate because he f***ed up, but he didn't pull the trigger." Detective Cappelluti stopped defendant and told him that the detectives wanted to speak with him on camera. The detective testified that he memorialized this hallway conversation in his police report. He further testified that, between the time he stated on the video that he was leaving to use the restroom, and the time he entered the room with defendant, approximately 50 seconds passed. It was during this 50 seconds that the exchange with defendant took place in the hallway.

¶ 20 The State next called North Chicago police officer Micah Cress, who testified to his personal knowledge of gangs as a member of the gang investigation unit. Officer Cress testified that, in October 2007, Williams was a known member of the Black P Stone gang. At that time, defendant, Green, Harmon, and Emmanuel were known members of the Four Corner Hustlers gang. Since approximately 2004, there had been a war going on between the Black P Stones and the Four Corner Hustlers.

¶ 21 Milwaukee police officer Russell Ewert was next to testify. He testified that, on October 26, 2007, around 7 p.m., he attempted to conduct a traffic stop of a tan Saturn with one headlight out. The Saturn drove off at a high rate of speed and, after a short chase, crashed. Two individuals exited the car and fled. Officer Ewert and his partner chased down the driver on foot. While the officers were attempting to place handcuffs on the driver, who was later identified as William Craigen, a group of 5 to 10 individuals approached them and began

yelling. The officers arrested the two most boisterous individuals, who were later identified as defendant and Harmon. After Waukegan detectives interviewed defendant that night, he was released with a citation for disorderly conduct at around 3:39 a.m. on October 27, 2007.

¶ 22 The State next read a stipulation into the record. If called to testify as an expert in the forensic examination of latent fingerprints, Anthony Spadafora would have testified that he examined 24 latent fingerprints collected from the Saturn by the Waukegan police department. Eleven fingerprints were suitable for comparison. The fingerprints of Harmon's right index finger and right middle finger matched the latent fingerprints discovered on the rear driver's-side door. The sample known fingerprints of defendant and Green were in poor condition and, as a result, no comparison with the fingerprints obtained from the car was possible.

¶ 23 The State's last witness was Corporal Joseph Wide of the Clarksdale, Mississippi, police department. Corporal Wide testified that he booked defendant and that defendant initially gave his name as Melvin Walker. On the day that Waukegan detectives arrived to interview defendant and Green, the police department was very busy. Another officer transported defendant and Green from the jail to the booking room, where they waited to be taken to the interview room. Green was interviewed first, and defendant was interviewed second. The Waukegan detectives were not able to walk freely around the police department, because the interior doors required a key card to open. However, the detectives were able to leave the interview room and go to the bathroom next to the interview room. The detectives were alone when they interviewed defendant and Green.

¶ 24 The State rested. Defendant's only evidence was a stipulation that Clarksdale police officers picked up defendant and Green from the Coahoma County jail at 3:57 p.m. on January 16, 2007, transported them to the Clarksdale police department, then picked them back up from the police department at 9:07 p.m. that evening. The defense rested.

¶ 25 In rebuttal, the State read a stipulation that, if called to testify, Detective Thomas would have testified that the interview of Green began at approximately 5:20 p.m. and that Clarksdale police officers picked up Green from the interview room at 6:05 p.m.

¶ 26 During closing argument, defense counsel urged the jury to believe that the video-recorded interview was staged and untrue. Counsel argued that it was unbelievable that, knowing that defendant had been uncooperative in Milwaukee, Detectives Thomas and Cappelluti went to Clarksdale and "just walked in and turned on the video camera, introduced themselves, and in 20 minutes had everything they needed." He urged the jury to infer that "something happened before that video camera was turned on."

¶ 27 The jury returned a verdict finding defendant guilty of first-degree murder. Defendant filed a posttrial motion in which he again raised the issue of the admissibility of the audio recording of the Milwaukee interview. The trial court denied the motion, and, following sentencing, defendant timely appealed.

¶ 28 ANALYSIS

¶ 29 Defendant argues that his conviction should be reversed because (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of first-degree murder under a

theory of accountability and (2) the trial court erred in not allowing him to introduce pursuant to Illinois Rule of Evidence 106 the audio recording of his Milwaukee interview.

¶ 30                                Sufficiency of the Evidence

¶ 31    Defendant argues that the evidence was insufficient because the State offered no evidence that defendant shared Harmon's intent to shoot Lewis or that there was a common criminal design among defendant, Green, Harmon, and Emmanuel. Defendant admits that he drove the Saturn, made the U-turn, was aware of the presence of the gun, and fled following the shooting, but argues that this was insufficient because he did not intend to aid the commission of a crime. Defendant asserts that "at most the evidence showed that [he] drove his car next to Williams's." He further contends that "[t]here was no evidence that anyone in [defendant's] car proclaimed an intent to shoot at the other car, that [defendant's] actions were designed to facilitate the shooting, or that [defendant] knew what Harmon's intent was prior to the shooting."

¶ 32    When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The reviewing court should not substitute its judgment for that of the trier of fact, who is responsible for weighing the evidence, assessing the credibility of witnesses, resolving conflicts in the evidence, and drawing reasonable inferences and conclusions from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). However, a reviewing court must set aside a defendant's conviction if a careful review of the evidence reveals that it was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 33    A person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2006). "To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence which establishes beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Words of agreement are not necessary to establish a common criminal design or purpose. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). Rather, knowledge of and participation in the criminal scheme are sufficient. *Perez*, 189 Ill. 2d at 267. Evidence that a defendant was present during the commission of the offense, that he maintained a close affiliation with his companions after the crime, that he failed to report the crime, and that he fled the scene is relevant to determining accountability. *Taylor*, 164 Ill. 2d at 141. Where a common criminal design or purpose is established, any acts in furtherance of the common design are considered to be acts of all parties to the design and "all are

equally responsible for the consequences of the further acts." *Perez*, 189 Ill. 2d at 267. However, mere presence at the scene of a crime and knowledge that a crime is being committed are insufficient to establish accountability. *Taylor*, 164 Ill. 2d at 140.

¶ 34    Defendant's discussion of the evidence on appeal is selective. Although defendant characterizes his conduct as innocent–by asserting that "at most the evidence showed that [he] drove his car next to Williams's"–he ignores that he told the Waukegan detectives during the Clarksdale interview that Williams, not Lewis, was the intended target of the shooting. Defendant further informed the detectives that the motive for attempting to shoot Williams was a fight outside an IHOP during which he and two other individuals were outnumbered by members of the Black P Stone gang. The State offered testimony from Detective Garcia that corroborated defendant's IHOP story. Although defendant was not named in Detective Garcia's police report, most of the fight's participants fled the scene, and one of the two individuals arrested following the fight was Green, who also participated in the shooting of Lewis. The State also presented evidence of an ongoing rivalry between the Black P Stone gang, of which Williams was a known member, and the Four Corner Hustlers gang, of which defendant admitted to being a member since age 14, which further corroborated defendant's video-recorded statement.

¶ 35    Defendant also ignores that he was arrested in Milwaukee in the presence of the Saturn that was used in the shooting. Further, the State presented evidence that Harmon's fingerprints were recovered from the rear driver's-side door of the Saturn, which, according to defendant's confession, was the position from which Harmon fired the gun into the Cadillac. Defendant also ignores that he told the detectives that after the shooting he fled to Milwaukee and, subsequently, to Mississippi.

¶ 36    In sum, there was substantial evidence that defendant had knowledge of a common criminal design to retaliate against a rival gang member. There also was evidence that defendant intended to facilitate the scheme when he made the U-turn, pulled alongside the Cadillac, and maintained speed while Harmon fired the gun, which Green had removed from a compartment of the Saturn and handed to Harmon. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

¶ 37    Defendant's reliance on *People v. Estrada*, 243 Ill. App. 3d 177 (1993), and *People v. Washington*, 375 Ill. App. 3d 1012 (2007), is misplaced. In *Estrada*, the defendant's conviction of first-degree murder under a theory of accountability was reversed where the evidence established that he had exited a car and brandished a tire iron before a codefendant fired shots from within the car, killing the victim. *Estrada*, 243 Ill. App. 3d at 185. The court reasoned that the defendant's act of exiting the car negated any inference that he was part of a common design or plan to shoot the victim. *Estrada*, 243 Ill. App. 3d at 185. In *Washington*, a defendant's conviction of attempted first-degree murder was reversed where the evidence against him consisted of testimony from alleged coconspirators that conflicted on critical points. *Washington*, 375 Ill. App. 3d at 1029. At trial, the State had argued that the defendant either fired the gun himself or drove the van from which the gun was fired. *Washington*, 375 Ill. App. 3d at 1024. On appeal, however, the court reasoned that there was no evidence regarding who shot the gun or who drove the van, other than the inconsistent and

contradictory testimony of the defendant's three alleged accomplices. *Washington*, 375 Ill. App. 3d at 1025-29. With one justice dissenting, the court concluded that "there was no remotely consistent account of the events *** or [the] defendant's role in them." *Washington*, 375 Ill. App. 3d at 1029.

¶ 38 Here, unlike the defendant in *Estrada*, defendant did not act in a manner that negated any inference that he was part of a common criminal design or plan. To the contrary, defendant acted in a way that *supported* the inference that he was part of a common criminal design to fire shots into the Cadillac. Defendant made a U-turn after spotting Williams's Cadillac and, as Green handed a gun to Harmon, defendant pulled alongside the Cadillac and maintained speed as Harmon fired the gun. Nor does this case resemble the facts of *Washington*, in which the primary evidence was the conflicting, inconsistent, and uncorroborated testimony of three alleged accomplices. Here, the critical evidence was defendant's own confession, which the State corroborated in key respects.

¶ 39                                    Admissibility of Milwaukee Interview

¶ 40 Defendant's second contention on appeal is that the trial court abused its discretion in not admitting, pursuant to Illinois Rule of Evidence 106, the audio recording of his October 27, 2007, interview with Waukegan detectives in Milwaukee. Defendant argues that his confrontational and defiant tone during the Milwaukee interview contrasted significantly with his defeated tone during his video-recorded Clarksdale interview. Defendant contends that, if admitted, the Milwaukee interview would have provided context to the Clarksdale interview and shown the states of mind of the Waukegan detectives during the Clarksdale interview.

¶ 41 We review evidentiary rulings for an abuse of discretion. *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 82. A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 82. To the extent that we must resolve the proper interpretation of Illinois Rule of Evidence 106, which involves a question of law, our review is *de novo*. *Lambert v. Coonrod*, 2012 IL App (4th) 110518, ¶ 18.

¶ 42 On September 27, 2010, the Illinois Supreme Court adopted the Illinois Rules of Evidence, which became effective January 1, 2011. The Special Supreme Court Committee on Illinois Evidence (Committee), which drafted the rules, "incorporated into the Illinois Rules of Evidence the current law of evidence in Illinois whenever the Illinois Supreme Court or the Illinois Appellate Court had clearly spoken on a principle of evidentiary law within the last 50 or so years." Ill. R. Evid., Committee Commentary (adopted Sept. 27, 2010). Illinois Rule of Evidence 106 provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Ill. R. Evid. 106 (eff. Jan. 1, 2011). The rule codified, at least in part, the common-law "completeness doctrine," which provides that " 'if one party introduces part of an utterance or writing the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper

context so that a correct and true meaning is conveyed to the jury.' " *People v. Williams*, 109 Ill. 2d 327, 334 (1985) (quoting *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 556 (1976)). The rule did not codify the common-law doctrine in its entirety, because the common-law doctrine applies to oral statements as well as to writings and recorded statements (see, *e.g.*, *People v. Nolan*, 291 Ill. App. 3d 879, 885 (1997)), while Rule 106 applies only to writings and recorded statements (Ill. R. Evid. 106 (eff. Jan. 1, 2011)). Furthermore, many courts apply the common-law completeness doctrine to permit an opposing party to question a witness on cross-examination about the remainder of a writing or oral statement (see, *e.g.*, *Nolan*, 291 Ill. App. 3d at 885), while Rule 106 permits an opposing party to "require the introduction *at that time* of any other part or any other writing or recorded statement which ought in fairness to be considered *contemporaneously* with it" (emphases added) (Ill. R. Evid. 106 (eff. Jan. 1, 2011)).

¶ 43    Rule 106 also varies from the common-law completeness doctrine in that it was 1 of 14 rules in which the Committee incorporated "uncontroversial developments with respect to the law of evidence as reflected in the Federal Rules of Evidence and the 44 surveyed jurisdictions." Ill. R. Evid., Committee Commentary (adopted Sept. 27, 2010). The Committee explained the modernization of the rule as follows: "Prior Illinois law appears to have limited the concept of completeness to other parts of the same writing or recording or an addendum thereto. The 'ought in fairness' requirement allows admissibility of statements made under separate circumstances." Ill. R. Evid., Committee Commentary (adopted Sept. 27, 2010). In *People v. Brown*, 249 Ill. App. 3d 986 (1993), for example, which was decided prior to the adoption of the Illinois Rules of Evidence, the court held that the completeness doctrine did not permit admission of a defendant's oral statement to a sergeant and a detective that was made one hour before a second oral statement to the same detective and an assistant State's Attorney. *Brown*, 362 Ill. App. 3d at 991. The court reasoned that the completeness doctrine applied only "to what was said on the same subject at the same time." (Internal quotation marks omitted.) *Brown*, 362 Ill. App. 3d at 990. By contrast, Rule 106 allows admission of writings or recorded statements that were not made at the same time as the admitted evidence. Ill. R. Evid. 106 (eff. Jan. 1, 2011).

¶ 44    Before reaching the merits of defendant's argument, we address his argument concerning the proper interpretation of Illinois Rule of Evidence 106. Defendant contends that, because the rule is nearly identical to Federal Rule of Evidence 106,[1] we should look to federal case law to guide our interpretation of the new rule. In particular, defendant urges us to adopt the test used in the Seventh Circuit to determine whether evidence is admissible under the federal rule. Under that test, the writing or recorded statement must be relevant, and the writing or recorded statement must (a) explain the admitted evidence, (b) place the admitted evidence in context, (c) avoid misleading the trier of fact, and (d) ensure a fair and impartial understanding of all of the evidence. *United States v. Velasco*, 953 F.2d 1467, 1475 (7th Cir. 1992). While we agree with defendant that looking to federal case law as persuasive authority

---

[1]Federal Rule of Evidence 106 allows introduction of "any other part–or any other writing or recorded statement–that in fairness ought to be considered at the same time" as a writing or recorded statement introduced into evidence. Fed. R. Evid. 106.

when interpreting an Illinois rule of evidence may be appropriate in certain circumstances (see *Citibank, N.A. v. McGladrey & Pullen, LLP*, 2011 IL App (1st) 102427, ¶ 21), doing so is unnecessary in this case.

¶ 45　　Although Illinois Rule of Evidence 106 differs from the common-law completeness doctrine in the respects noted above, there is no indication that the rule altered the other requirements for admissibility under the completeness doctrine, which are well developed in Illinois case law. Specifically, under the common-law completeness doctrine in Illinois, the remainder of a writing, recording, or oral statement is admissible if necessary to prevent the trier of fact from being misled (*People v. Caffey*, 205 Ill. 2d 52, 90-91 (2001)), to place the admitted portion "in proper context so that a correct and true meaning is conveyed to the jury" (*Lawson*, 64 Ill. 2d at 556), or "to shed light on the meaning of the evidence already received" (*People v. Patterson*, 154 Ill. 2d 414, 453 (1992)). Put another way, " '[a] defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State.' " *Caffey*, 205 Ill. 2d at 91 (quoting *People v. Olinger*, 112 Ill. 2d 324, 338 (1986)). These requirements for admissibility under the common-law completeness doctrine are easily applied to writings or recorded statements sought to be admitted under Illinois Rule of Evidence 106, which renders looking to federal case law unnecessary.[2]

¶ 46　　Turning to the merits of defendant's argument, we disagree with his assertion that playing the audio recording of his Milwaukee interview for the jury somehow would have placed his Clarksdale interview in context or assisted the jury in understanding it. During his Milwaukee interview, defendant denied having knowledge of the stolen Saturn or being in Waukegan on October 18, 2007. During his Clarksdale interview, which was nearly three months later, defendant told Detectives Thomas and Cappelluti that he traded drugs for the Saturn and that he participated in the shooting of Lewis in Waukegan on October 18, 2007. The former interview did not shed light on the latter interview or place it in context–it merely contradicted it. Consequently, the recording of the Milwaukee interview was not admissible under Illinois Rule of Evidence 106. See *People v. Pietryzk*, 153 Ill. App. 3d 428, 438-39 (1987) (statements were inadmissible under completeness doctrine where they did not explain or qualify admitted statements but merely contradicted them). Again, under the common-law completeness doctrine, the remainder of a writing, recording, or oral statement is admissible only if required to prevent the jury from being misled, to place the admitted portion in context so that a true meaning is conveyed, or to shed light on the meaning of the admitted portion, and the same holds true for admissibility of a writing or recorded statement under Illinois Rule of Evidence 106. Simply because a writing or recorded statement is related to an admitted writing or recorded statement, or pertains to the same subject matter, does not mean that it satisfies the requirements for admissibility under Rule 106.

¶ 47　　Defendant's contention that the audio recording should have been admitted to show the

_____

[2]As a practical matter, the requirements for admission under the common-law completeness doctrine in Illinois do not differ significantly from the factors in the Seventh Circuit's test, and our result would not be different were we to apply the federal test.

contrast between his confrontational and defiant tone during the Milwaukee interview and his defeated tone during the Clarksdale interview misses the mark. According to defendant, his confrontational and defiant tone during the Milwaukee interview placed the Clarksdale interview in context because it would have allowed the jury to infer from his defeated tone in Clarksdale that his statements were not voluntary. This inference is too tenuous and speculative to satisfy the requirements for admissibility under Rule 106. The Clarksdale interview was played in full for the jury, and we cannot say that defendant's calm and candid statements on the video were misleading, taken out of context, or misunderstood simply because defendant previously had energetically denied being in Waukegan on the night of the shooting. Defendant's purported confrontational and defiant tone during the Milwaukee interview would not in any way have prevented the jury from being misled, provided context, or assisted the jury in understanding his Clarksdale interview.

¶ 48    Furthermore, defendant's argument regarding his tone during the Milwaukee interview reveals a misunderstanding about the purpose of Rule 106. The rule is not a means to admit evidence that aids a defendant in proving his or her theory of the case. For example, here, defendant maintains that his contrasting tones during the two interviews would have tended to prove that his statements in Clarksdale were not voluntary. Rather, the purpose of Rule 106 is to correct the misleading nature of a writing or recorded statement or a portion thereof that has been taken out of context or is difficult to understand on its own. Where, as here, a defendant has not shown that the admitted writing or recorded statement, standing alone, is misleading, Rule 106 does not provide an avenue for admitting another writing or recorded statement.

¶ 49    Similarly unavailing is defendant's argument that admission of the Milwaukee interview would have put the "techniques and mind set" of Detectives Thomas and Cappelluti before the jury. Like defendant's argument regarding his confrontational and defiant tone, defendant's argument regarding the "techniques and mind set" of the Waukegan detectives is far too tenuous and speculative to satisfy the requirements for admissibility under Rule 106. Although both detectives testified that they were aware, at least to some degree, that defendant had been uncooperative during the Milwaukee interview,[3] the detectives appear on the video of the Clarksdale interview calmly asking defendant a series of questions, which defendant calmly answers. Moreover, the only evidence of an off-camera discussion was Detective Cappelluti's testimony concerning his brief encounter with defendant in the hallway outside the interview room, during the 50 seconds after Detective Cappelluti left to use the restroom. Based on this evidence, we cannot say that the audio recording of the Milwaukee interview would have shown the detectives' "techniques and mind set" in any meaningful way, or in any way that was necessary to prevent the jury from being misled, to provide context, or to assist the jury in understanding the videotaped Clarksdale interview.

---

[3]Detective Thomas testified that he knew that defendant had been uncooperative during his Milwaukee interview. Detective Cappelluti testified that he had not listened to the audio recording of the Milwaukee interview prior to interviewing defendant in Clarksdale; however, upon further questioning, he testified that he knew that defendant had not allowed Waukegan detectives to bring him from Milwaukee to Waukegan for questioning.

Any techniques the detectives used to obtain defendant's statement were on full display for the jury.

¶ 50 Defendant's reliance on *United States v. Haddad*, 10 F.3d 1252 (7th Cir. 1993), is misplaced. In *Haddad*, which involved Federal Rule of Evidence 106, the Seventh Circuit determined that the trial court erred (although the error was harmless) when it admitted the inculpatory portion of the defendant's statement to police without allowing the defendant to admit the exculpatory portion of the same statement. *Haddad*, 10 F.3d at 1259. The defendant was charged with knowing possession of a semiautomatic handgun, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year. *Haddad*, 10 F.3d at 1254. At trial, the government introduced the defendant's admission to police that he was aware of the bag of marijuana found six inches from the handgun at issue. *Haddad*, 10 F.3d at 1258-59. The trial court did not permit the defendant to introduce the remainder of his statement, in which he told officers that he had no knowledge of the gun. *Haddad*, 10 F.3d at 1258. On appeal, the Seventh Circuit reasoned that admission of the inculpatory portion of the defendant's statement, without also admitting the exculpatory potion, might have misled the trier of fact because it suggested that the defendant also knew of the gun. *Haddad*, 10 F.3d at 1259.

¶ 51 Here, the Clarksdale interview bears no similarity to the inculpatory statement introduced by the government in *Haddad*. The Clarksdale interview, taken alone, did not mislead the jury into inferring that defendant had inculpated himself when in fact he had not. Nor was the Clarksdale interview incomplete or taken out of context. Again, the Milwaukee interview merely contradicted the Clarksdale interview; it did not contain any statements necessary to prevent the jury from being misled, to place the Clarksdale interview in context so that its true meaning was conveyed, or to shed light on its meaning.

¶ 52 In sum, the trial court did not abuse its discretion in excluding the audio recording of defendant's Milwaukee interview.

¶ 53                                          CONCLUSION

¶ 54 For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 55 Affirmed.