2025 IL App (1st) 231852-U

No. 1-23-1852

Order filed August 8, 2025

FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 07318 |
| | ) | |
| IVAN HODGES, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MITCHELL delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's first degree murder conviction is affirmed where the prosecutor's comments during closing argument were not clear and obvious error under the plain error doctrine, and the circuit court did not commit plain error in sustaining the State's hearsay objection regarding statements defendant made to police officers.

¶ 2    Defendant Ivan Hodges appeals his conviction for first degree murder following a jury trial. 720 ILCS 5/9-1(a)(1), (2) (West 2018). The issues on appeal are: (1) whether the State's closing argument included improper and inflammatory remarks that constituted plain error, and (2) whether the circuit court committed plain error by sustaining the State's hearsay objection

regarding statements defendant made to police officers while being transported to the police station. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     On April 6, 2018, Tiffany Allen called the Chicago Police Department and asked for a well-being check for her downstairs neighbor, Renee Watkins. Allen had last seen Watkins on the evening of April 4.

¶ 5     Three officers from the Chicago Police Department, including Officer Jasmine Tucker, arrived and entered Watkins's apartment. The officers discovered Watkins face-up on the floor of her bedroom in a pool of blood. She had died as a result of at least 35 stab wounds across her body. Detective Stacy Lewis and evidence technician Paul Carriere arrived to investigate the crime scene and collect evidence. They observed blood splatter throughout the apartment, including on the interior doorknob of the front security door and on the nightstand in the bedroom. There were also several bloody shoeprints starting in the bedroom and leading towards the front door. Officers collected several items from the apartment for DNA testing including: a vodka bottle and beer can found in the kitchen garbage can, a plastic water bottle, plastic cup, and shot glass found in the living room, and a bloody beer can found on the nightstand in the bedroom.

¶ 6     A year later, in April 2019, officers were notified that a DNA sample found on the plastic water bottle matched the DNA profile of defendant Ivan Hodges. Four officers, including Detective James Moloney and Detective Jeffrey Rodenberg, drove to defendant's residence to question him regarding Watkins's death. The officers showed defendant a picture of Watkins and asked defendant if he knew her. Defendant denied knowing Watkins or ever visiting her residence. Defendant was arrested and taken to the police station for further questioning.

¶ 7    During the ride to the station, after being read his *Miranda* rights, defendant asked why he was under arrest. The officers told defendant that his DNA had been found in Watkins's apartment as well as large bloody shoeprints that they "believed reasonably matched his stature." Defendant was six feet and six inches tall and weighed 275 pounds. Defendant told the officers that he actually did know Watkins and had killed her in self-defense during an argument while in her apartment. After being shown the photo of Watkins again, defendant confirmed she was the person he had killed. Defendant was taken to Watkins's residence, which defendant confirmed was the location where the altercation had occurred.

¶ 8    At the police station, the detectives conducted an electronically recorded interview with defendant. In the interview, defendant stated that he had been to Watkins's apartment three or four times prior to the altercation. According to defendant, on the night of April 4, 2018, Watkins invited him to her apartment, where they talked, listened to music, and consumed alcohol. Around 3:00 a.m. the pair began arguing about money. Watkins grabbed a knife and attacked defendant, cutting the top of his left hand. Defendant then disarmed Watkins and "stabbed her up" and "cut her fucking throat." Defendant also told the detectives that he threw away the size 15 shoes he was wearing that night because he was scared the shoes would incriminate him due to their size and because they were covered in Watkins's blood.

¶ 9    At trial, Dr. Yongfei Wu, a forensic scientist from the Illinois State Police lab, testified regarding additional DNA testing performed after defendant's arrest. Dr. Wu testified that Watkins's DNA was included in samples taken from the beer cans found in the bedroom and in the kitchen garbage can. Defendant's DNA was included to a very high degree of certainty in samples taken from the vodka bottle in the kitchen garbage can as well as the shot glass and the

plastic water bottle in the living room. Specifically, Dr. Wu testified that only one out of 1.4 trillion unrelated individuals would have the DNA profile recovered from the vodka bottle, only one out of 476 sextillion unrelated individuals would have the DNA profile recovered from the shot glass, and only one out of 67 octillion unrelated individuals would have the DNA profile recovered from the plastic water bottle. On the interior doorknob of the front security door, there was a partial DNA profile that matched one in three unrelated individuals in the general population, including defendant. Finally, DNA profiles belonging to two separate unidentified men who were not defendant were included in samples taken from the plastic cup in the living room and blood splatter on the bathroom floor.

¶ 10    Defendant testified in his own defense. Defendant recanted his previous confession and testified that he did not kill Watkins. Defendant stated that he had previously visited Watkins's apartment but had only ever been in her living room. He denied that he told the detectives that he did not know Watkins when they visited his residence in 2019 and denied that the detectives showed him a photograph of Watkins. He also denied that while he was being driven to the police station he told the detectives that he killed Watkins in self-defense. Defendant testified that it was the detectives' idea that he say that he acted in self-defense. Defendant admitted that he confessed to killing Watkins in the recorded interview at the police station but testified that everything he said during the interview was not true. Defendant said that he gave a false confession because he was intimidated by the police officers and was afraid that they were going to "beat the hell out of [him]."

¶ 11     The State called Detective Moloney as a rebuttal witness, who testified that he was present when an evidence technician took photographs of a scar on defendant's left hand on the day he was arrested. The photographs were admitted into evidence.

¶ 12     The jury convicted defendant of first degree murder, and the circuit court sentenced defendant to 30 years' imprisonment. This timely appeal followed. Ill. S. Ct. R. 606 (eff. Sept. 18, 2023).

¶ 13                                    II. ANALYSIS

¶ 14                            A. State's Closing Argument

¶ 15     Defendant argues that his conviction should be reversed and the case remanded for a new trial because the prosecutor made improper statements during closing argument. Specifically, defendant contends that the prosecutor's comments were improper because they asserted factual claims that were not supported by the evidence and were unduly inflammatory.

¶ 16     Defendant failed to preserve this issue for review because he failed to make a contemporaneous objection at trial and did not raise the issue in his posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27. However, defendant contends that we can reach this issue under the plain error doctrine, a limited exception to the general forfeiture rule. *People v. Herron*, 215 Ill. 2d 167, 177 (2005); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). For the plain error doctrine to apply, defendant must show that a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445,

¶ 48 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). Therefore, the first question under the plain error doctrine is whether a clear or obvious error occurred. *Id*. ¶ 49.

¶ 17    "Prosecutors are afforded wide latitude in closing argument." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). A new trial is only warranted when a prosecutor's comments engendered substantial prejudice against the defendant such that the improper remarks were a material factor in the defendant's conviction. *Id.* "Improper remarks are a material factor if (1) the jury could have reached a contrary verdict had the improper remarks not been made or (2) the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction." *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 48. "When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context." *People v. Johnson*, 385 Ill. App. 3d 585, 604 (2008).

¶ 18                                        1. Comments About Bloody Shoeprints

¶ 19    Defendant argues that the prosecutor made improper comments during closing argument that overstated the probative value of the shoeprints found in Watkins's apartment. During closing argument the prosecutor stated:

> "[Defendant] was living his life for over a year destroying evidence. How do we know this? Because in his statement he talks about the bloody shoes, the same bloody shoes that made this huge bloody footprint. Why is this so big? Because he wears a size 15 shoe."

During the State's rebuttal closing argument, the prosecutor again referred to the bloody shoeprints:

> "Then you look at the rest of the evidence, the other physical evidence, the DNA from the vodka bottle, DNA from the shot glass, the bloody shoe print size, massive bloody shoe prints. The defendant has a size 15 foot."

¶ 20 A prosecutor may comment on the evidence in closing argument and "on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant." *People v. Perry*, 224 Ill. 2d 312, 347 (2007). Officer Tucker testified that upon entering Watkins's apartment, she saw bloody shoeprints at the back of the residence in the kitchen and bedroom. They were partial shoeprints of the front part of the shoe, and she believed that they were all made by the same pair of shoes. Detective Lewis testified that she observed "about eight" bloody partial shoeprints that appeared to start from the bedroom where Watkins was found and head in the direction of the apartment's front door. Several photographs of the bloody shoeprints were admitted into evidence. Some of the photographs included a ruler for scale. Evidence technician Carriere agreed with the prosecutor that one of these photographs showed "a pretty large impression of a shoe." Finally, in defendant's recanted confession, he stated that he threw away the size 15 shoes he was wearing that night because he was scared the shoes would incriminate him due to their size and because they were covered in Watkins's blood. Based on this evidence, the State could argue the "fair and reasonable" inference that the large bloody shoeprints officers observed in Watkins's apartment came from the blood-covered size 15 shoes that defendant referenced in his recanted confession.

¶ 21 Defendant contends that the inference that defendant created the bloody shoeprints was improper because there was no evidence in the record establishing that the shoeprints matched defendant's shoe size. Defendant argues that none of the trial witnesses testified that they believed the bloody shoeprints were a match for defendant's feet and that, even if they had, their testimony would have been impermissible under Illinois law because there was no factual basis for such a conclusion. See *People v. Campbell*, 146 Ill. 2d 363, 378 (1992) (holding that a shoe's "pattern

and other general characteristics, alone, are seldom sufficient for identification purposes"); *People v. McFadden*, 2021 IL App (5th) 170139-U, ¶ 95 (holding that officer's shoeprint testimony that lacked "both unique characteristics and general characteristics" of the shoe was "unreliable identification evidence that would have been excluded had counsel objected").

¶ 22    However, the State did not argue that a scientific examination or comparison of defendant's shoes and the bloody shoeprints had been made or that a forensic analysis had demonstrated that the shoeprints belonged to defendant. Instead, the prosecutor was making an argument based on circumstantial evidence that the large bloody shoeprints found inside Watkins's apartment belonged to defendant because, in his recanted confession, defendant had said that he had disposed of his size 15 shoes because they were covered in blood. See *Campbell*, 146 Ill. 2d at 379 ("[S]hoeprint evidence is circumstantial."); *People v. Stremmel*, 258 Ill. App. 3d 93, 109 (1994) ("Although mere general characteristics of shoeprints, such as size, style, and brand name are seldom sufficient for identification purposes, they may give rise to reasonable inferences which tend to establish guilt or innocence."). The jury was permitted to consider defendant's recanted confession as evidence when determining whether the shoeprints belonged to defendant. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 107 (holding that "a recanted statement alone can be sufficient to support a conviction, even without corroborating evidence").

¶ 23        2. Comment About Defendant Drinking Beer During the Stabbing

¶ 24    Defendant argues that the prosecutor improperly inflamed the passions of the jury by inviting the jury to speculate that defendant was drinking beer while he was stabbing Watkins on the floor. "A prosecutor cannot use closing argument simply to inflame the passions or develop the prejudices of the jury without throwing any light upon the issues." (Internal quotation marks

omitted.) *Wheeler*, 226 Ill. 2d at 128-29. It is improper to "incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation." *People v. Johnson*, 208 Ill. 2d 53, 79 (2003).

¶ 25    During closing argument, the prosecutor asked the jury to consider whether defendant was drinking beer while he stabbed Watkins on the floor:

> "And what was [defendant] doing while he was stabbing [Watkins]? How is it that there is a ring of blood on her nightstand where the [beer] can was previously sitting? This is a can that has blood on it. It was sitting here. Was he drinking beer while stabbing her on the floor? How does that happen?"

¶ 26    Defendant argues the prosecutor's comment was improper because there was no evidence presented at trial that would support the inference that defendant drank beer while stabbing Watkins. Defendant emphasizes that Carriere (the evidence technician) testified that, to his knowledge, there was nothing to indicate that defendant ever touched or drank from the beer can on the bedroom nightstand and, further, that Dr. Wu testified that the DNA sample taken from the mouth opening of the beer can was a single source female DNA profile that included Watkins's DNA profile.

¶ 27    However, during his recanted confession recorded at the police station, defendant admitted to drinking alcohol with Watkins on the night of the murder. A prosecutor may invite the jury to make a reasonable inference based on the evidence presented at trial. See, *e.g.*, *People v. Jackson*, 2020 IL 124112, ¶ 82 (holding that prosecutors "may comment on the evidence and on any fair and reasonable inference the evidence may yield"). Here, the State reminded the jury that the beer can had blood on it and that there was a ring of blood on the nightstand where the beer can had previously been located.

¶ 28                          3. Comments About Doorknob DNA Evidence

¶ 29    Defendant contends that, during closing argument, the prosecutor overstated the probative

value of the DNA analysis of the biological material found on the doorknob of the front security

door of Watkins's apartment. Twice during closing argument, the State asserted that the DNA on

the doorknob belonged to defendant:

> "And what does he do when he finishes? He touches the door, turns the knob. He leaves a
> little bit of his DNA there. He leaves the house.
> * * *
> This is the exterior door, the knob that had a little bit of his DNA on it when he
> turned that knob and left the unit after killing her."

¶ 30    Dr. Wu testified that he performed a DNA analysis on a sample taken from the interior

doorknob of the front security door. The doorknob was coated in blood splatter. Dr. Wu testified

that the analysis results showed "a mixture of two contributors." The major contributor was a

female DNA profile that included Watkins's DNA profile. The minor contributor was a partial

DNA profile that matched one in three unrelated individuals in the general population, including

defendant. From this evidence, the jury could reasonably infer that defendant deposited his DNA

and a bit of Watkins's blood on the doorknob when he touched it with his hand.

¶ 31    Defendant argues that the comments were misleading because they "incorrectly suggested

that [Dr. Wu] had concluded within a reasonable degree of scientific certainty that it was

[defendant] who left his DNA on the doorknob." However, the State was not required to remind

the jury of the statistical frequency of defendant's DNA association with the sample taken from

the doorknob. The comments were a reasonable characterization of the evidence presented at trial.

*People v. West*, 137 Ill. 2d 558, 592 (1990) ("A prosecutor may argue any logical inference that

can be drawn from the evidence.").

¶ 32                    4. Comment About Victim Being a Mother

¶ 33    Defendant argues that the State improperly encouraged the jury to convict defendant based upon sympathy for Watkins's family, rather than on the factual merits of the case, by asking the jury to consider the fact that Watkins was a mother. The prosecutor stated that "Renee Watkins was a human being. She was a mother. She didn't deserve this."

¶ 34    "[J]ury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper." *People v. Bernette*, 30 Ill. 2d 359, 371 (1964). "However, common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." (Internal quotation marks omitted.) *People v. Hope*, 116 Ill. 2d 265, 275 (1986) (quoting *People v. Free*, 94 Ill. 2d 378, 415 (1983)). Therefore, a prosecutor's comment regarding the deceased's family is not *per se* reversible error. *People v. Harris*, 225 Ill. 2d 1, 31 (2007). Such comments are reversible error only where "the prosecution has dwelt upon the deceased's family to the point that the jury would have related that evidence to the defendant's guilt." *People v. Kitchen*, 159 Ill. 2d 1, 33 (1994).

¶ 35    Here, the prosecutor briefly mentioned that Watkins was a mother at the beginning of the State's closing argument. This was the only reference to Watkins being a mother throughout 11 pages of closing argument. See *Jackson*, 2020 IL 124112, ¶ 87 (holding that length of closing arguments may be considered when assessing a comment's prejudicial effect). Because the reference was brief and was not repeated, we cannot say that the State dwelt upon Watkins's family to the point that the jury would have related that evidence to defendant's guilt. *Harris*, 225 Ill. 2d at 32-33 (holding that the prosecutor's two comments that the victims were "father[s] and

husband[s]" were not "so improper as to warrant reversal of defendant's convictions" where "the comments were not dwelled upon by the State in any way and no attempt was made to relate defendant's punishment to the existence of the victims' family"); *People v. Sandifer*, 2016 IL App (1st) 133397, ¶¶ 48-58 (holding that the prosecutor's four comments about the victim during closing argument, including that she "was a human being and she didn't deserve what happened to her," were not "so substantial that they would cause the jury to relate evidence regarding her family to defendant's guilt"); *People v. Sanders*, 168 Ill. App. 3d 295, 301 (1988) (holding that prosecutor's comments in closing argument regarding victim's family, while improper, "did not dwell upon survivors' tender ages or contain significantly inflammatory language" and so "did not prejudice defendant so as to deprive him of a fair trial").

_____

¶ 36 Because the comments in the State's closing argument were not improper, no "clear or obvious error occurred" and defendant's argument under the plain error doctrine fails. *People v. Jackson*, 2022 IL 127256, ¶ 21 ("When a defendant invokes the plain error rule, the first step in the analysis is to determine whether a clear or obvious error occurred.").

¶ 37 Alternatively, defendant argues that his trial counsel provided him with ineffective assistance because counsel failed to object to the prosecutor's remarks during trial. An ineffective assistance of counsel claim is governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under this test, a defendant must show that his "attorney's performance fell below an objective standard of reasonableness" and that his "attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Jackson*, 2020

IL 124112, ¶ 90. However, because the comments in the State's closing argument were not improper, defendant cannot establish that he was prejudiced by his counsel's failure to object. See, *e.g.*, *People v. Elizondo*, 2021 IL App (1st) 161699, ¶¶ 87-89 ("As we have determined that there was no reversible error in the State's closing arguments and further that defendant was not prejudiced by any error in the complained-of remarks, defendant cannot show that he was prejudiced by his trial counsel's failure to object to the complained-of remarks to satisfy *Strickland.*").

¶ 38       B. Excluded Hearsay Testimony Regarding Defendant's Confession

¶ 39    Defendant contends that the circuit court improperly sustained the State's hearsay objection and prevented defense counsel from eliciting specific details regarding defendant's self-defense claim. Generally, a circuit court's evidentiary rulings are reviewed for an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Here, however, defendant failed to preserve this issue for review because he did not make a contemporaneous objection at trial and did not raise the issue in his posttrial motion. *Colyar*, 2013 IL 111835, ¶ 27. Again, defendant argues that the issue can nonetheless be reviewed for plain error.

¶ 40    During the State's direct examination, Detective Rodenberg testified that, while defendant was being driven to the station, he told the officers that he had killed Watkins in self-defense after the two of them had argued but did not give the officers any further details about the incident:

> "Q. Once confronted with the DNA and the bloody shoe print, what, if anything, did the defendant state to you?
> A. He told us he wanted to be truthful about the situation. He told us that he wasn't being truthful earlier when he told us he didn't know the victim and hadn't been at the residence. He then told us that he had been at the residence and an argument ensued and he was attacked and needed to defend himself.
> Q. Argument between who?

A. [Watkins] and himself.

Q. Did he state any details about the argument and what happened leading up to him defending himself?

A. Not so much in the vehicle. It was a little bit later on.

Q. Did he elaborate — maybe not in great deal, but did he elaborate at all as to how he defended himself while in the vehicle?

A. He just generally stated he stabbed her in self-defense."

¶ 41    Defendant argues that his trial counsel sought to elicit the specific details of defendant's purported confession in the police car during his cross-examination of Detective Rodenberg but was prevented from doing do when the circuit court improperly sustained the State's hearsay objection to this line of inquiry:

"Q. [Y]ou say that in the vehicle [defendant] made certain statements to you?

A. Yes.

Q. When you got to the station, you put [defendant] in a room?

A. Correct.

Q. And at some point you indicated that he said he wanted to be honest with you, correct?

A. Yes.

Q. And he told you that he had known [Watkins] for at least a period of time, correct?

A. Yes.

Q. He said when they got to her apartment did they have anything to drink, if you recall?

A. He did.

Q. Did they do anything that, if you recall, other than drink?

A. They listened to music.

Q. And he said at some point in the time she started arguing with him. Is that correct?

A. Correct.

Q. In fact, at some point in time she came after him with a knife. Is that right?

A. That's correct.

Q. He told you what he did as he defended himself, correct?

A. Yes.

* * *

Q. Did he tell you that he stabbed her until she stopped attacking him?

[ASSISTANT STATE'S ATTORNEY]: Objection.

THE COURT: I will let him answer.

A. I don't believe he used those words, no.

Q. Do you remember what the exact words were that he used?

A. There were a lot of words that he used to describe that attack. They varied depending on what time he said them in the interview. His description of his reacting to her varied throughout the interview.

Q. He told you after that took place he became frightened. Is that correct?

A. He did, yes.

Q. And he left, correct?

A. He said he left, yes.

* * *

Q. Did [defendant] tell you that before he got the knife from her she had actually stabbed him?

A. He did tell me that, yes.

Q. Did he indicate, in fact, where he had a stab mark on his hand?

[ASSISTANT STATE'S ATTORNEY]: Judge, objection. I ask for a side bar.

THE COURT: What's the basis for the objection?

[ASSISTANT STATE'S ATTORNEY]: Hearsay.

THE COURT: What he said to the detective?

[ASSISTANT STATE'S ATTORNEY]: What the defendant said is hearsay at this point, your honor, when the Defense is eliciting it.

THE COURT: It is. Sustained."

¶ 42 Defendant argues that the State had elicited an incomplete portion of the confession defendant gave in the police car when Detective Rodenberg testified that defendant "just generally stated he stabbed her in self-defense." Defendant contends that, pursuant to the completeness doctrine, his trial counsel should have been permitted to elicit further details concerning defendant's police car confession and that the circuit court's sustaining of the State's hearsay objection was improper. *People v. Weaver*, 92 Ill. 2d 545, 556 (1982) (" '[W]here a conversation is related by a witness the opposing party has a right to bring out all of the conversation on cross-examination.' " (quoting *People v. Nakutin*, 364 Ill. 563, 571 (1936))).

¶ 43 Under the completeness doctrine, "when a portion of a conversation is related by a witness, the opposing party has a right to bring out the remainder of that conversation to prevent the trier

- 15 -

of fact from being misled." *People v. Ward*, 154 Ill. 2d 272, 311 (1992). Therefore, the remainder of an oral statement is admissible under the completeness doctrine if it is necessary to "prevent the trier of fact from being misled," to "place the admitted portion in proper context so as to convey the correct and true meaning to" the trier of fact, or to "shed light on the meaning of evidence already presented." *People v. Viramontes*, 2021 IL App (1st) 190665, ¶ 51. However, the doctrine is limited in scope; the testimony regarding the oral statement "must actually be misleading." *Caffey*, 205 Ill. 2d at 91. "A defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State." *People v. Olinger*, 112 Ill. 2d 324, 338 (1986).

¶ 44    The completeness doctrine does not apply, because Detective Rodenberg's initial testimony was not misleading. *Caffey*, 205 Ill. 2d at 91. In *People v. Weaver*, the supreme court held that the completeness doctrine applied because the jury was only allowed to hear part of what the defendant had told a neighbor on the night of the murder, and thus the jury "may have been misled into thinking that [the defendant] had given no details about the men she claimed had entered her home" which "may have made jurors more likely to believe that the story was false." *Weaver*, 92 Ill. 2d at 556-57. Here, the State asked Detective Rodenberg directly whether defendant had given any details while in the police car regarding the argument with Watkins and how defendant defended himself during the incident. Detective Rodenberg answered that while defendant elaborated "a little bit later on," defendant gave no details during the car ride and "just generally stated he stabbed [Watkins] in self-defense." Unlike in *Weaver*, Detective Rodenberg's testimony clearly informed the jury that defendant had given no further details about his self-defense claim during the car ride to the station.

¶ 45    Defendant also contends that the circuit court violated Illinois Rule of Evidence 106, which requires the admission of related writings or recordings. Ill. R. Evid. 106 (eff. Jan. 1, 2011) ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."). However, "Rule 106 applies only to writings and recorded statements," and therefore also does not apply here. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 42.

¶ 46    Because Rule 106 and the completeness doctrine are inapplicable here, the circuit court did not err in sustaining the State's hearsay objection. Accordingly, defendant's argument that his trial counsel was ineffective for failing to object to the circuit court's ruling also fails. See, *e.g.*, *Elizondo*, 2021 IL App (1st) 161699, ¶¶ 87-89.

¶ 47                                    III. CONCLUSION

¶ 48    The judgment of the circuit court of Cook County is affirmed.

¶ 49    Affirmed.